UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-60251-CIV-ZLOCH

GRANDIS FAMILY PARTNERSHIP,
LTD. d/b/a ADVANCED POWER
TECHNOLOGIES,

      Plaintiff,

vs.                                          O R D E R

HESS CORPORATION,

      Defendant.
_____/

THIS MATTER is before the Court upon Defendant Hess Corporation's Motion To Stay The Litigation And Compel Arbitration, Or, In The Alternative, To Transfer Venue (DE 12). An evidentiary hearing was held before this Court on July 8, 2008, at which the Parties presented evidence in support of and opposition to the instant Motion. The Court has carefully reviewed said Motion and the entire court file and is otherwise fully advised in the premises.

## I. Background

This is a difficult case. It involves several discrete areas of New York contract law coupled with imperfect facts; the combination of which is appropriately found on the pages of cruel contracts exams given by law professors clad in bow ties. Nevertheless, pursuant to this Court's diversity jurisdiction, the following facts were adduced and legal issues raised by the Parties for this Court to resolve.

Defendant Hess Corporation (hereinafter "Hess") and Plaintiff

Advanced Power Technologies (hereinafter "APT") began working together in 2003, when Hess contracted with APT for it to service and maintain the lighting at many of Hess's retail gas stations in Florida. Hess was pleased with their business relationship, and in June of 2007, Hess expanded its business with APT by purchasing several orders of lighting ballasts.

In the same year, Hess began accepting bids for a major renovation of its gas stations' outdoor lighting. It planned to replace the existing lighting and ballasts with more energy-efficient models. APT's bid was accepted, and in May of that year, the Parties began negotiating the terms of their agreement. When the Parties' formal agreement was memorialized on July 2, 2007, it consisted of an eleven-page written agreement, complete with eighty pages of appendices, schedules, and forms. However, for certain business reasons, APT began its performance on the project in late June of that year.

The first eleven pages of the Parties' contract was a form prepared by Hess's legal department, which it has used for over a decade. Transcript of Evidentiary Hearing, DE 33, pp. 36, 47 (hereinafter "Transcript"). At the evidentiary hearing, John Garabino, the Hess representative who negotiated the contract with APT, testified that the eleven-page contract was used as a base for the contractual agreement with APT, while the appendices and schedules attached thereto made up the heart of the Parties' agreement. Transcript pp. 46-48. Despite the contract with its appendices and Schedules being seemingly exhaustive in their

2

breadth and detail, it did not contain an arbitration clause or venue provision.  Pertinent to the instant Motion, the contract contained a clause listing the documents that were to be incorporated by reference, DE 12, Ex. 1, ¶ 2, an integration clause, id. ¶ 29, and a choice-of-law clause, id. ¶ 32, whereby the Parties agreed that New York law governs any disputes.

After the Parties' agreement was formalized but before the project was completed, the Parties' relationship broke down.  APT responded by filing suit in Florida state court, wherein it alleged that Hess was in breach of the contract.  Hess timely removed the suit to this Court.  See DE 1.  With its Answer, it filed a counterclaim for breach of contract and conversion against APT. The factual basis for the counterclaim is immaterial to this Order.

After the case was at issue but before discovery had commenced, Hess filed the instant Motion (DE 12).  In it, Hess argues that any disputes arising from the contract must be referred to arbitration, despite the contract's silence concerning the same. In support of this position, Hess cites the terms and conditions referenced in the thirty-two Purchase Orders it sent APT for work performed under the contract.  The face of the Purchase Order references the contract's Schedules and forms in several different areas, including each of the individual projects' start and completion dates, as well as forms APT was to complete with the work it performed.  See DE 12, Ex. 3.  Directly under the Purchase Order's style was the following sentence, in bold:

**THE PURCHASE ORDER TERMS AND CONDITIONS AS WELL AS THE**

3

SHIPMENT ROUTING POLICY LOCATED AT http://www.hess.com/PO /HessMR.htm ARE INCORPORATED BY REFERENCE IN THIS PURCHASE ORDER.

DE 12, Ex. 2.  By viewing the website listed above, APT would see the additional terms and conditions that it was deemed to assent to by filling the Purchase Order.  Among the terms and conditions located on the Hess website, one is of particular importance to this Motion: the arbitration clause.  It states, in pertinent part, that "all disputes, claims, questions, or differences shall be finally settled by arbitration."  DE 12, Ex. 4, ¶ 34.

Hess seeks to refer this case to arbitration and makes four arguments for why the arbitration clause is binding on APT.  First, the Hess Purchase Order was formally incorporated by reference into the Parties' contract.  Second, the Hess Purchase Order and the contract should be read together as one document, because the Purchase Orders were the vehicles through which the contract was implemented; without them, APT could not perform under the contract.  DE 12, p. 11.  Third, the Hess Purchase Order and the contract should be read together, because "[s]igned and unsigned writings relating to the same transaction and containing all the essential terms of a contract may be read together to evidence a binding contract."  DE 12, p. 12.  And fourth, the Hess Purchase Orders stand alone as separate contracts binding APT to arbitrate the claims arising under them.  Id. at 12.  The Parties stipulate that if the arbitration clause referenced in the Purchase Orders is binding then all of the claims and counterclaims raised in this action would be referred to arbitration.

4

The thrust of the instant Motion (DE 12) focuses on the first two arguments, with passing reference to the third and fourth; Hess spends little more than a sentence briefing each of the latter two arguments. At the evidentiary hearing, Hess proceeded solely on the argument that the Hess Purchase Orders were incorporated by reference into the contract. DE 33, p 64. In its closing argument, Hess relied on the logic of the second argument to the bolster its first: Hess reasoned that because APT could not perform without the Purchase Orders, they were necessarily incorporated by reference in Schedule C into the contract. Id. pp. 62-63.

Hess did not argue at the hearing that the Hess Purchase Orders were incorporated by reference through implication or that because the two documents were executed contemporaneously, or more accurately, near the same time, they should be read together. Nor did Hess argue that the Purchase Orders were a modification of the contract. In fact, when asked whether the Hess Purchase Orders amended the contract, Hess's attorney responded: "I don't believe so, your Honor. . . . It is our position that the purchase orders were one of th[e] documents incorporated by reference and, therefore, form a part of the contract that the parties entered into." DE 33, p. 64.

In response to Hess's four arguments, APT argues that under New York law an agreement to arbitrate must be clear and unambiguous. Aerotech World Trade Ltd. v. Excalibur Sys., Inc., 654 N.Y.S.2d 386, 387 (N.Y. App. Div. 1997). Thus, the generic reference to "purchase orders" in Schedule C fails, as a matter of

5

law, to incorporate the terms and conditions of the Hess Purchase Orders into the Parties' contract. It also takes the position that Hess's alternative arguments fail to establish that the arbitration clause on the Hess website should be read into the contract.

As expressed more fully below, the Court finds that the reference to "purchase orders" in Schedule C is insufficient to formally incorporate by reference the Hess Purchase Orders into the contract. Further, the facts adduced at the hearing did not establish that APT's prior dealings with the Hess Purchase Orders containing the arbitration clause were sufficient to impute knowledge of their existence and terms to APT. APT's employees testified that over the years Hess had issued thousands of purchase orders to APT, none of which resembled those at issue here. Only the purchase orders dealing with the ballast purchases contained the website link, and APT's processing clerk and President took no notice of the modified form. Further, there was contradictory testimony concerning whether APT ever received a copy of the Hess Purchase Orders with the website terms and conditions in a meeting held prior to entering into the contract. Thus, knowledge of the Hess Purchase Orders with their terms and conditions cannot be imputed to APT when it was entering into the contract with Hess.

Hess's alternative arguments also fail. Its theory that the Purchase Orders and the contract should be read together because APT could not perform under the contract without them is without a basis in New York law; even if general contract principles supported Hess's argument, the evidence adduced at the hearing does

6

not permit the Court to make a finding that APT could not perform
under the contract without Hess issuing its Purchase Orders.   The
caselaw cited by Hess in support of its position that the Purchase
Orders and contract should be read together as relating to the same
transaction thereby evidencing a single binding contract is
inapposite to this case.   The pertinent issue in this litigation is
not whether a single binding contract exists, but whether the
single binding contract includes terms contained only in the
Purchase Orders.   Further, Hess's argument that the Purchase Orders
constituted separate contracts that bound APT beyond the terms
previously agreed to in the contract is without a basis in law,
absent the Purchase Orders being viewed as a modification of the
Parties' formal agreement.   Therefore, the Court will deny Hess's
Motion To Compel Arbitration (DE 12) and allow this case to proceed
on its merits in this Court.

## II. Standard of Review

The Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. (2006)
(hereinafter the "FAA"), requires the enforcement of valid
arbitration agreements involving interstate commerce.   Under § 2 of
the FAA,

> [a] written agreement in . . . a contract evidencing a
> transaction involving commerce to settle by arbitration
> a controversy thereafter arising out of such contract or
> transaction, . . . shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in
> equity for the revocation of any contract.

9 U.S.C. § 2 (2006).   By enacting the FAA, "Congress declared a
national policy favoring arbitration."   Wheat First Securities Inc.

v. Green, 993 F.2d 814, 817 (2d Cir. 2001) (quoting Southland Corp.
v. Keating, 465 U.S. 1, 10 (1984)).  This policy, as directed by
the Supreme Court, requires courts to give arbitration agreements
"a liberal reading."  Moses H. Cone Mem'l Hosp. v. Mercury Constr.
Corp., 460 U.S. 1, 23 n.27 (1983).  Thus, "[a]ny doubts concerning
the scope of arbitral issues should be resolved in favor of
arbitration."  Id. at 24-25.  This dictate extends to every facet
of the agreement, "whether the problem at hand is the construction
of the contract language itself or an allegation of waiver, delay,
or like defense to arbitrability."  Id. at 24 (citing Wick v. Atl.
Marine, Inc., 605 F.2d 166, 168 (5th Cir. 1979)).

      While this strong national policy directs the Court's reading
of arbitration provisions in contracts, it cannot run roughshod
over fundamental contract law and principles.  Before the Court can
enforce an arbitration clause, it must find that an agreement to
arbitrate was made, because federal law "does not require parties
to arbitrate when they have not agreed to do so."  Volt Info.
Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489
U.S. 468, 478 (1989).  Thus, while "[f]ederal law establishes the
enforceability of arbitration agreements, . . . state law governs
the interpretation and formation of such agreements."  Employers
Ins. of Wausau v. Bright Metal Specialties, Inc., 251 F.3d 1316,
1322 (11th Cir. 2001).  The Parties agree that New York law applies
to this action and that if the arbitration clause is binding then
all the claims and counterclaims arising in this action would be

referred to arbitration.  Therefore, the dispositive issue before the Court is whether under New York law the Parties ever formulated an agreement to arbitrate their disputes.

### III. <u>Incorporation by Reference</u>

Hess's principal argument for referring this case to arbitration is that the Hess Purchase Order, complete with its terms and conditions on the Hess website, is incorporated by reference into the contract.  New York adheres to the common-law principle that parties are free to incorporate into a contract terms that are contained in a separate, independent document.  In order for the separate, referenced document to be incorporated, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." <u>Lamb v. Emhart Corp.</u>, 47 F.3d 551, 558 (2d Cir. 1995).  New York courts have expressed the rule as "requir[ing] that the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be <u>identified beyond all reasonable doubt</u>." <u>Paine Weber, Inc. v. Bybyk</u>, 81 F.3d 1193, 1201 (2d. Cir. 1996) (quoting <u>Chiacchia v. Nat. Westminster Bank</u>, 124 A.D.2d 626, 628 (N.Y. App. Div. 1986) (emphasis supplied in <u>Bybyk</u>)).  For the incorporated terms to be binding "it must be clear that the parties know of and consented to the terms to be incorporated by reference." <u>Creative Waste Mgt. v. Capt. Envtl. Servs.</u>, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006).  An oblique reference to a separate, non-contemporaneous document is

insufficient to incorporate the same into the contract. <u>Ryan, Beck & Co., LLC v. Fakih</u>, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003).

Courts outside New York recognize that incorporation by reference may also be accomplished by implication. <u>See</u> Richard Lord, <u>Williston on Contracts</u> § 30:26 (subtitled "Writing Implicitly Incorporated by Reference"). In those cases, the analysis focuses on what the parties would clearly understand, given their mutual understanding and knowledge of the terms in question. <u>See, e.g.</u>, <u>Newton v. Smith Motors, Inc.</u>, 175 A.2d 514, 516 (Vt. 1961). This is no different than when courts give particular terms the meaning they are ascribed in the specialized trade or industry, rather than relying upon the plain meaning of the term outside that context. <u>See, e.g.</u>, <u>Frigaliment Importing Co. v. B.N.S. Int'l Sales, Corp.</u>, 190 F. Supp. 116 (S.D.N.Y. 1960) (discussing the meaning of the term "chicken") (Friendly, J.).[1]

Hess cites both the language of the contract and APT's prior notice of and dealings with the Purchase Orders to establish that the website's terms are incorporated by reference into the

---

[1] It is unclear whether New York law adheres to this standard. Hess has not cited caselaw holding that it does, and the Court's independent review does not suggest that New York courts have embraced the otherwise sound and established principle that the parties' mutual understanding and knowledge of a term in a contract could serve to incorporate it by reference. Because Hess's argument extends beyond the document's four-corners to incorporate the separate document by reference, and for the benefit of a complete review of Hess's arguments, the Court will assume <u>arguendo</u> in Part III.B of this Order that New York law permits incorporation by reference through implication.

contract.  Thus, Hess makes two arguments: one on the four corners of the contract and the other on the Parties' use and understanding of the term "purchase orders."

A.

Hess's primary argument is based on the contract's language: the term "purchase order" is used in Schedule C, and therefore, the Hess Purchase Orders are incorporated by reference into the contract.  Schedule C states that "[a]fter receipt of a purchase order for each subproject the Contractor may submit a payment application for 30% of the purchase order value." DE 12, Ex. 2, p. 88.  The next paragraph states: "After receipt of an approved changed [sic] order Contractor may submit a payment application for the remaining value of the purchase order (total revised purchase order value less the 30% of original purchase order value previously paid)." Id.  There is no other reference to purchase orders in the 91 pages that make up the Parties' formal agreement.

To bolster its argument that the Purchase Orders are incorporated by reference, Hess introduced the testimony of John Garabino.  He testified that he reviewed the contract with APT before entering into it and felt it was clear that the references to purchase orders in Schedule C was to the Purchase Orders used by Hess.  Transcript pp. 27-28.  He also testified that a sample Hess Purchase Order, complete with the terms and conditions on the website, was provided to APT representatives at a meeting held in late May with APT, Hess, and the supplier of the materials used on

11

the project.   Id. pp. 12-19.   In support, Hess introduced as Defendant's Exhibit 1 an email with an agenda of the May 23, 2007, meeting attached.   Garabino also testified that Purchase Orders with the bolded language quoted above, directing a reader to the Hess website, were sent to APT when Hess ordered ballasts in June of 2007.   Id. pp. 28, 35; Hess Exhibit 4.   Hess also introduced into evidence an email APT sent it commenting on the Purchase Orders Hess sent in June of 2007 regarding the purchase of ballasts.   Hess Exhibit 3.

The precise issue for this Court to determine is whether the language of Schedule C clearly referenced the Hess Purchase Orders to make it clear, beyond a reasonable doubt to APT that the Hess Purchase Order was being incorporated by reference into the contract.   Bybyk, 81 F.3d at 1201.   Whether an extrinsic document is incorporated by reference is a question of law.   See Advanced Display Sys, Inc. v. Kent St. Univ., 212 F.3d 1272 (Fed. Cir. 2000).   As such, the Court looks first to the language of the contract; if its language is ambiguous, then the Court will look to the "mutual knowledge and understanding on part of both parties [to determine] that reference by implication is clear."   Newton v. Smith Motors, Inc., 175 A.2d 514, 516 (Vt. 1961).

Looking first to the plain language of the contract, it is clear that the only reference to purchase orders is found in Schedule C.   Hess argues that these references refer APT to the Hess Purchase Orders that they were previously provided with,

complete with the reference to the Hess website. As noted above, to incorporate the Hess Purchase Orders by reference, Hess must establish that the contract's language both identifies beyond all reasonable doubt the Hess Purchase Orders and makes clear that they are being incorporated by reference into the contract. Bybyk, 81 F.3d at 1201.

In contrast to the high bar set by New York caselaw, Schedule C's references to "purchase orders" speak in a vague and general sense. It does not reference a specific Purchase Order or specific form of purchase order, nor does the contract state that such a Purchase Order is being incorporated by reference. Grammatically, this general rather than specific reference is evidenced by the drafter's choice to refer to purchase orders as a common noun, rather than a proper noun. The latter would evidence a particular purchase order, one that any person reading the contract would either expect to be attached to the contract, or, if not attached, the use of a proper noun would lead APT to expect the purchase order referenced to have a definite form that they are either aware of or should take the time to apprise themselves of. This lack of specificity is confirmed by the drafter's use of the indefinite article "a" when first referring to "purchase orders" in Schedule C, rather than the definite article "the."[2] As it stands, Schedule

---

[2] When the definite article is used in the second paragraph of Schedule C, it modifies the anaphora of the antecedent "a purchase order" that is found in the first paragraph. Thus, the first reference to purchase orders in schedule C is a general reference,

13

C's language refers to a generic form, purchase orders, that is common to most industries and does not immediately or clearly denote the specific Hess Purchase Orders, with their particular provisions.[3]  See, e.g., <u>Joy v. City of St. Louis</u>, 138 U.S. 1, 31 (1891) (noting that when a document's meaning is doubtful, grammar and punctuation add light to a text's meaning).

The language of Schedule C does not make a deliberate attempt to alert the reader that the Hess Purchase Orders are being incorporated by reference, or that any purchase orders are being incorporated by reference.  This failure is highlighted by contrasting the clauses throughout the contract incorporating other forms by reference with the reference to purchase orders in Schedule C.  In the second provision of the contract it states:

> This Contract consists of this document, together with the following listed documents as attached and any document incorporated herein by reference: (collectively, "this Contract")
> (1) Schedule A: "Basis and Scope of Work"
> (2) Schedule B: "Items to be Furnished By Owner"
> (3) Schedule C: "Progress Payments"
> (3) [sic] Schedule D: "Contractor's Affidavit"
> (4) Schedule E: "Change Order"

DE 12, Ex. 1, ¶ 2.A.  The five areas listed above correspond to

_____

while the later, specific reference found in the second paragraph merely refers the reader back to the first, general reference.

[3] Had different stylistic choices been made by the Schedule C's drafters, APT would have been on notice that Schedule C was referring to a definite purchase order that was attached, or it would have imputed a duty of inquiry to APT for it to determine the import and effect of the term "purchase order" used in Schedule C. However, it is unclear whether the use of distinct language alone would have risen to the standard demanded by New York law.

14

many of the forms attached to the contract and are clearly
incorporated therein. In Schedule D, the Contractor's Affidavit
has a definite form that is referenced to as a proper noun, and it
is attached. Id. p. 91. In Schedule E, the Change Order is
referenced as a proper noun, see id. ¶¶ 13, 16, and it is also
attached to the contract. Id. p. 92. The clarity of the second
provision of the contract permits a party to the contract, or a
court interpreting it, to know precisely the forms and terms that
are being incorporated by reference into the contract.

Schedule C is unlike Schedules D and E. Both of those
Schedules are stand-alone forms that have been formally
incorporated by reference into the contract. In contrast, Schedule
C contains numerous pages of information, the terms of which could
be expected to be part of the Parties' agreement. A sensible
reading as to the effect of Schedule C being listed among the
documents incorporated by reference is that the entire Schedule, as
a separate document, is incorporated by reference into the 11-page
contract. This would be consistent with how Schedules B, D, and
E operate: each Schedule is a separate document that has become
part of the contract through its specific incorporation by
reference in the second provision of the contract.

Hess is then, essentially, arguing that the Hess Purchase
Orders are incorporated by reference into Schedule C and Schedule
C is incorporated by reference into the contract. Nothing in
Schedule C, however, indicates with any semblance of intention or

15

clarity that it is incorporating a document by reference. It strains credulity to argue that every common noun referenced in each of the Schedules incorporates by reference a separate non-attached document into the contract.

Reading the contract as a whole and contrasting the purchase-order language of Schedule C with the rest of the contract, it is clear that the drafter did not evidence an intent to formally incorporate by reference the Hess Purchase Orders into the contract. Even if the drafter personally intended to incorporate by reference the Hess Purchase Orders, the document's reference to purchase orders was oblique and did not "identif[y] beyond all reasonable doubt" the non-contemporaneous document he sought to incorporate by reference: the Hess Purchase Order. Bybyk, 81 F.3d at 1201. The Hess Purchase Orders were not among the items explicitly incorporated by reference in the second provision, they are not referred to as proper nouns, they were not attached to the contract, and the sole reference to "purchase orders" in Schedule C was both oblique and without any indication that it was incorporating a specific document by reference into the contract or Schedule C.

That is not to say that a form being referred to as a proper noun is a necessary condition to have a form incorporated by reference. It is possible that a form could be of such a unique nature that absent being set out with particularity it would be incorporated by reference into the contract because of the mutual

16

knowledge and understanding of the parties.   However, with the generic title "purchase order" used in Schedule C, there is nothing that would convey to a person reading the contract a direct and specific indication that a particular document is being incorporated by reference.   Purchase orders are a common form in the service industry.   Without a definite understanding being set forth for the Parties, knowledge that "purchase orders" in Schedule C refers to the Hess Purchase Orders cannot be imputed to APT.

B.

The language of the contract fails to clearly set forth that the term "purchase order" in Schedule C is meant to incorporate by reference the Hess Purchase Orders; nevertheless, for the benefit of the Parties and any reviewing court, the Court will look to what the Parties clearly understood "purchase orders" in Schedule C to mean, given their dealings in the formation of the contract.   In considering parol evidence, Hess's burden remains the same, namely some contract must identify beyond a reasonable doubt that the Hess Purchase Orders are being incorporated by reference.   Hess can establish through testimony and documents outside the contract what APT understood the term "purchase orders" in Schedule C to mean. See Newton, 175 A.2d at 516.   At the hearing, Garabino testified that APT was provided with the Hess Purchase Orders twice before the contract was signed: once at the May 27 meeting and again when Hess purchased ballasts through APT.   Transcript pp. 12-22.   Hess argues that this May 27 meeting establishes that APT knew precisely

17

what the term "purchase order" in Schedule C referred to, because Hess presented APT with a sample Purchase Order complete with the link to the website that contained the arbitration clause.

At the evidentiary hearing, APT denied having any prior knowledge of the Hess Purchase Orders and the terms and conditions on the website.  Several Hess Purchase Orders, complete with the website link, were sent to APT for the ballasts purchased in June of 2007.  APT's president Devin Grandis testified that the sale of ballasts was done as a courtesy for Hess, and because of that, he paid no attention to the Purchase Orders that were sent for the ballasts.  APT's vice president Freddie Manfretti testified that in the course of APT's dealings with Hess he handled hundreds if not thousands of purchase orders from Hess, and not one of them contained a link to a website containing an arbitration clause. The administrative assistant, Cathy Cole, who dealt with the Purchase Orders for the ballasts also testified that she took no notice of the link to the website, she only paid attention to the fact that the wrong parts number was listed on the order.  She mistakenly assumed that those Purchase Orders were like the others that she had processed from Hess.

All of the APT employees testified that in their previous dealings with Hess the purchase orders sent did not resemble those at issue here with the link to the website.[4]  This fact is critical

---

[4] At the evidentiary hearing, Counsel for Hess implied during cross-examination that APT had previously received work orders and

because without actual knowledge of these prior Purchase Orders being sent for the ballasts, the term "purchase order" in Schedule C would not carry any significance for APT to know that it incorporated by reference the Hess Purchase Orders with the additional terms.   Thus, there was nothing in the prior Purchase Orders for ballasts that would have made APT representatives conscious of the website link and the additional terms contained therein when it signed the contract with Hess.

Additionally, APT's president Devin Grandis testified that neither the Purchase Orders nor the terms and conditions contained on Hess's website were provided to him at the meeting held between APT and Hess on May 27, 2008.   Both Manfretti and Cathy Cole testified to this fact.   After observing the demeanor of the witnesses for APT, the Court finds their testimony to be credible. In addition, on cross-examination Hess's representative Garabino was not positive that he provided a copy of the Purchase Orders to APT representatives at the meeting; he was only sure that the agenda reflected that they would be discussed.   See DE 33, pp. 43-46.   He testified that his assistant Sue Thompson was in charge of handing out the Hess Purchase Order and the terms and conditions on the website.   He also believed that because the topics were on the agenda the APT representatives would have received a copy.

---

not purchase orders from Hess.   However, this point was never clarified and no evidence was submitted by Hess to substantiate the same.

19

However, Hess failed to call Sue Thompson, the person who did have actual knowledge of whether a sample Hess Purchase Order was actually distributed to APT. Id. pp. 45-46. Based on the testimony and evidence, it is not clear whether APT was provided the Purchase Orders with the terms and conditions at the May 23, 2007 meeting, which would have given APT knowledge of what the term "purchase order" in Schedule C was referring to.

The high standard set by New York law to incorporate an independent document by reference into a contract demands that knowledge of the document's existence be mutual. The Court finds that the behavior and knowledge of the Parties prior to and through the course of formulating the contract fails to establish that the Hess Purchase Orders were identified beyond all reasonable doubt to APT. Thus, the Hess Purchase Orders are not incorporated by reference into the contract. Therefore, the arbitration clause contained on the Hess website is not a term of the contract, and for that reason it is not binding on APT.

C.

As an aside, the Court will address Hess's reliance on certain New York caselaw, including Liberty Management v. Fifth Avenue & Sixty-Sixth St. Corp., 208 A.D.2d 73 (N.Y. App. Div. 1995), for its position that Schedule C's reference to "purchase orders" was sufficient to incorporate the Purchase Orders by reference. In its briefs Hess cites several instances when New York courts have incorporated external documents into a contract by reference.

20

However, each of those cases is distinguishable from the facts of this case.  Specifically, in Liberty Management the parties did not have a written contract, and the court determined the existence and scope of the parties' agreement on the basis of several communications sent between them.  The documents that contained the arbitration clause were specifically referenced in those communications.  The communications also referenced a specific trade document, an American Institute of Architects agreement (hereinafter "AIA agreement"), that the parties knew contained an arbitration clause, or were at least on notice of that fact.  Id. at 76 (noting that under either version of the agreement, the plaintiff agreed to arbitrate).  Further, Liberty Management dealt with the construction industry, where there are specific practices, including arbitration, that govern relationships throughout the trade.  Id. at 74-76 (discussing the import and effect of the AIA contract in the trade).

The facts of Liberty Management are easily distinguishable from this case.  Its holding does nothing to erode the clear standard that has been articulated by New York courts for when a document may be incorporated by reference: a document that is to be incorporated by reference must be "identified beyond all reasonable doubt."  Bybyk, 81 F.3d at 1201.

## IV. Hess's Alternative Arguments

As noted above, Hess also argues in the alternative that the contract and the Hess Purchase Orders, complete with the

arbitration clause, should be read as one document because they were the vehicle by which the Parties conducted business. Second, the contract and the Hess Purchase Order should be read together because they were executed at the same time and deal with the same subject and thus "may be read together to evidence a binding contract." DE 12, p. 11. (quoting <u>Weiner & Co. v. Teitelbaum</u>, 107 A.D.2d 583, 583 (N.Y. App. Div. 1985)). Third, Hess argues that the thirty-two Purchase Orders stand alone as thirty-two separately executed contracts between the Parties, and because all of the Parties' claims and counterclaims are contemplated under the thirty-two Purchase Orders, then the arbitration clause would compel arbitration.

A.

Hess's first argument is that the Purchase Orders were the vehicle through which the contract was executed, and therefore they must be read together. Hess does not refer the Court to any caselaw in New York or any other jurisdiction that supports this argument. And the cases Hess cites, <u>Collins & Aikman Products Co. v. Building Sys., Inc.</u>, 58 F.3d 16, 23 (2d. Cir 1995) and <u>Specht v. Netscape Commn's, Corp.</u>, 306 F.3d 17, 36-38 (2d Cir. 2002), do not stand for such a broad proposition. In <u>Collins</u>, the Second Circuit simply decided the scope of the arbitration clause in question. <u>Collins</u>, 58 F.3d at 18 ("The sole issue in the appeal is the scope of this clause."). Further, <u>Collins</u> clearly set forth which claims fell under the arbitration agreement and which lay outside. The

22

Specht opinion, in both its reasoning and holding, is likewise inapplicable; it dealt with whether certain claims touch matters covered by the arbitration agreement. Specht, 306 F.3d at 36. It did not address whether an ancillary document, in the instant action a purchase order, should be read together with the parties' contract, when the ancillary document was not explicitly incorporated by reference. Nothing cited by Hess supports its position that the two documents should necessarily be read together because the Purchase Orders are the vehicle through which the contract was implemented.

There is one case from the Fourth Circuit adopting Hess's argument, though it was applied to distinguishable facts. In JJ. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir. 1988), the Fourth Circuit upheld the district court's finding that the arbitration clause found in the parties' distribution agreement was binding upon the parties' claims involving separately executed documents: their purchase orders, security agreements, and compensation agreement. The court found that the ancillary contracts were the means by which the distribution agreements were implemented. Thus, the terms of one agreement flowed to the other.

The instant action would be the reverse, where the contract was silent on arbitration, and the Hess Purchase Order and its terms would be read back into the contract. However, nothing in Hess's briefing on this matter or in the Court's own review of New York law supports the New York Court of Appeals adopting the

23

principles and reasoning found in <u>JJ. Ryan & Sons</u>.  <u>See</u> <u>Erie R.R.</u>
<u>Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); (noting that when a
federal district court exercises its diversity jurisdiction, the
court is bound to apply the law of that state whether "declared by
its Legislature in a statute or by the highest court."); <u>see also</u>
28 U.S.C. § 1652 (2006).  And the Court cannot expand New York
contract law beyond the holdings of the New York Court of Appeals.

Further, Hess did not introduce any evidence at the
evidentiary hearing or make any argument there or in its briefs to
support the conclusion that the Purchase Orders' terms must be read
into the contract because they were the vehicle for performance.
Noone was called to testify how the Purchase Orders and contract
complemented each other or how they were necessary to implement the
agreement.  Garabino testified that without the Purchase Orders APT
would not be able to submit a billing statement for payment from
Hess.  But he did not testify that without the Hess Purchase Orders
APT would be incapable of performing under the contract.  While APT
may not have been able to navigate the Hess accounts-payable
bureaucracy without the Purchase Orders, that fact alone did not
preclude APT from knowing how and when to perform under the
contract.  Nothing presented to the Court suggests or establishes
that the Hess Purchase Orders were a necessary condition to either
APT or Hess performing under the agreement.  The opposite is true:
APT began performing under the agreement before it was memorialized
and before Hess had issued a single Purchase Order.

24

B.

Hess's second argument for reading the Hess Purchase Orders and contract together is that "[s]igned and unsigned writings relating to the same transaction and containing all the essential terms of a contract may be read together to evidence a binding contract." DE 12, p. 11 (quoting Weiner, 107 A.D.2d at 583). This argument is misplaced. Weiner and all of the cases Hess cites with it either involve instances where several documents are read together to evidence a contract and place an agreement outside the Statute of Frauds or are inapplicable to Hess's stated proposition.[5] Other than when writings may be read to place an agreement outside of the Statute of Frauds, Hess has not articulated any reason for why the Hess Purchase Orders and the contract should be read together.

The limits of Hess's second alternative argument are evidenced by the terms Hess uses to frame its position. Its proposition for reading the documents together is directed to instances when

---

[5] See Weiner, 107 A.D.2d at 583 ("The sole issue presented to us is whether an unsigned, but dated, memorandum agreement plus two subsequent letters referring to that agreement, may be so read together. We find that they may and therefore reverse Special Term's dismissal based upon the Statute of Frauds."); Crabtree v. Elizabeth Arden Sale Corp., 305 N.Y. 48, 54 (1953) ("The statute of frauds does not require the memorandum . . . to be in one document.") (quotation omitted); Liberty Management, 208 A.D.2d 73 (discussed above); World Rentals and Sales, LLC v. Volvo Const. Equipment Rentals, 517 F.3d 1240, 1245 (11th Cir. 2008) ("[W]e agree with the World Parties that the unambiguous language of the Loan Documents incorporates the arbitration clauses in the Franchise Agreements.").

writings may be read together "to evidence a binding contract." DE

12, p. 11 (quoting Weiner, 107 A.D.2d at 583) (emphasis added).

The general rule is that a formal contract with an integration

clause represents the parties' entire agreement and thereby

expresses all of the parties' negotiations, conversations, and

agreements made prior to its execution. Richard Lord, Williston on

Contracts §§ 33:21, 33:14; see Tempo Shain, Corp. v. Bertek, Inc.,

120 F.3d 16, 21 (2d Cir. 1997); Mfrs. Hanover Trust Co. v. Yankas,

7 F.3d 310 (2d Cir. 1993).

Hess did not argue in the instant Motion or at the evidentiary

hearing that documents executed at substantially the same time and

related to the same subject matter may be read together as one.

Lord, supra § 30:26. Thus, the Court deems this argument waived,

and there is nothing in the record that compels the Court to raise

it sua sponte for Hess. See Batiste v. Burke, 746 F.2d 257, 259

n.2 (5th Cir. 1984) (noting courts will only raise an issue sua

sponte for exceptional circumstances). However, for the benefit of

the Parties and any reviewing court, the Court will address this

unmade argument and why it is unpersuasive.

Under New York law, all writings that form part of a single

transaction may be read together.  Liberty USA Group, Inc. v.

Buyer's Choice Ins. Agency, LLC, 386 F. Supp. 2d 421, 425 (S.D.N.Y

2005).   Thus, even outside instances when the existence of a

written contract must be established for purposes of the Statute of

Frauds, documents executed at substantially the same time and

26

related to the same subject matter may be read together as one. This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998).

This principle allows courts to read several contracts together, even when they do not refer to each other and are between different parties. See Wells Fargo Bank Minnesota v. CD Video, Inc., 6 Misc. 2d 1003, 2004 WL 3029875 (N.Y Sup. Ct. 2004) (noting that "the rule applies where one contract does not refer in terms to the other, or even where in one of the contracts it states that there are no other contracts between the parties") (citing Williams v. Mobil Oil Corp., 83 A.D.2d 434, 439 (N.Y. App. Div. 1981)). However, the ability of courts to broadly read contracts together is always conditioned upon the intent of the contracting parties. Liberty USA Group, Inc., 386 F. Supp. 2d at 425 (noting that such a reading is permissible only absent evidence of contrary intent). When the parties intend documents to be read as one, and evidence this fact by the document's language and their behavior, courts will read them together. Elite Promotional Marketing, Inc. v. Stumacher, 779 N.Y.S.2d 525, 528 (N.Y. Sup. Ct. App. Div. 2004) (noting that "there was clearly a manifest intent on the part of the parties that the agreements should be read together") (quotation omitted); see also id. at 526 ("The primary standard is the intent manifested, viewed in the surrounding circumstances."). But where there is no such evidence, courts are obliged to keep the agreements separate. See Arciniaga v. General Motors, Corp., 460 F.3d 231, 237 (2d Cir. 2006).

New York courts look to many factors, including the form of the contracts, the parties' behavior, and the effect of each contract on the other when determining whether the separate documents should be read together. Here, the contract and the first Purchase Order were executed one week apart. The contract and the Purchase Orders deal with the same subject matter: the relighting of Hess gas stations. The Hess Purchase Orders also reference the contract and various Schedules contained therein. While much of this suggests that the two should be read together, there is nothing that establishes that the intention to read the documents together was mutual.

First, the testimony at the evidentiary hearing and the language of the contract itself do not evidence an intent to read the two documents together. There was no testimony that the contract was not self-executing or somehow dependent on the issuance of Purchase Orders. Cf. JJ. Ryan & Sons, Inc., 863 F.2d at 321 (noting that without the later documents, all the parties would have had was an exclusive distribution agreement, without the obligation to purchase). In fact, Devin Grandis testified that APT began performing under the agreement before a Purchase Order was issued. The contract also had an integration clause evidencing that the document was meant to stand alone. DE 12, Ex. 2, ¶ 29. Further, Hess never introduced any evidence that beyond a formal incorporation by reference these documents should be read together by implication.

Second, the divergent evidence produced by both Parties prevents the Court from finding a mutual intent by the Parties to read the two documents together. Hess believed that the Purchase Orders were incorporated by reference, which they were not. Hess's representative did not see the Purchase Orders as a "non-severable package." Arciniaga, 460 F.3d at 237. Garabino testified that he viewed the Purchase Orders as being incorporated by reference, not that they were mutually dependent documents or contracts. The distinction is subtle but important: just because a party desires to have a document incorporated by reference does not necessarily mean that the two documents have a symbiotic relationship that creates a "non-severable package." In this case they surely were not; APT was able to fulfill its duties under the contract without a Purchase Order being issued.

Additionally, APT's representatives testified that the Purchase Orders and terms were never shown to them prior to signing the contract, and that they never assented to the same. Thus, there was never any intent by APT to be bound by the terms and conditions with the Hess Purchase Orders, let alone to have them read together with the contract.[6]

---

[6]While an argument could be made, but was not, that the Purchase Orders were additional terms proposed by Hess to APT after entering into the contract, the fact remains that the contract had an integration clause and a specific clause governing the means by which the Parties were able to amend the contract. DE 12, Ex. 2, ¶ 30.

29

Thus, while the form of the contract and Hess Purchase Orders suggests that they should be read together, the substance of the agreements and the Parties' intent, as manifested in the documents and as testified to at the evidentiary hearing, neither suggest nor establish that the Parties' mutual intent was to have the two documents read together. Therefore, in accord with New York contract law, the Court declines to read the contract and the Hess Purchase Orders together as a non-severable package. Stumacher, 779 N.Y.S.2d at 526; Arciniaga, 460 F.3d at 237. Other documents not incorporated by reference will not be considered part of the contract absent there being a modification of the contract. See Pervel Industries, Inc. v. T.M. Wallcovering, Inc., 871 F.2d 7 (2d Cir. 1989).

Third, there was little evidence presented as to the effect of the documents on one another. The testimony that was presented established nothing more than the fact that the Hess Purchase Orders permitted APT to seek partial payment for the sub-projects before their completion. As discussed above, nothing presented by Hess establishes or suggests that without the Purchase Orders APT would be incapable of performing under the contract. These two documents do not have a symbiotic relationship that would suggest, let alone establish, they are a non-severable package. Because the record is silent on this point, the Court cannot make a finding that these two documents must be read together.

C.

30

Hess's third argument is that the Purchase Orders could stand alone as contracts and bind APT to arbitrate because they are the means by which the Parties conducted their business. DE 12, p. 12. The case cited by Hess in its brief on this point stands for the single proposition that "purchase orders [alone] may create a binding contract." <u>Kay-Bee Toys Corp. v. Winston Sports Corp.</u>, 214 A.D.2d 457, 458 (N.Y. App. Div. 1995). The principle that purchase orders serve as contracts is well established. However, that naked principle of contract law does not extend to the instant case.

Here the Parties have entered into an exhaustive contract that fully contemplates the breadth of their agreement; the contract was the sole meaningful manifestation of the Parties' mutual assent. The Purchase Orders were not independent contracts, because they contemplated the identical subject matter and consideration between the Parties that the contract represented. The Purchase Orders and the terms and conditions of the website are similar to additional terms proposed by Hess to APT. They do not stand as independent contracts or as a novation of the contract. At the very most, Hess has established that the Hess Purchase Orders served as a bureaucratic key that APT was forced to use when it sought payment from Hess for work performed under the contract.

The instant Purchase Orders are also distinguishable from the purchase orders referenced in <u>Pervel Industries, Inc. v. T.M. Wallcovering, Inc.</u>, 871 F.2d 7 (2d Cir. 1989). In that case the parties entered into a formal, exclusive distribution agreement

31

that did not contain an arbitration clause. Pervel, 871 F.2d at 8-9. After receipt of each purchase order, Pervel sent confirmation orders containing an arbitration clause to T.M. Wallcovering. The Second Circuit held that the distribution agreement was nothing more than an offer for a unilateral contract, which was accepted by T.M.'s purchase of the product line. Id. at 9. Therefore, the Pervel court concluded, that the distribution agreement and purchase orders with their confirmations had a clear and direct relationship. Id. Thus, each purchase order with its confirmation was allowed to stand alone as a contract, and its arbitration clause was held binding on the parties. Id.

In this case, the contract was a self-executing performance contract. It lists 22 pages of Hess gas stations in Schedule A of the contract and breaks out the sequence of performance into 16 distinct sub-projects. This case is distinguishable from Pervel, and thus the conclusion that the Purchase Orders are separate contracts or that APT ratified the additional terms and conditions proposed in the Hess Purchase Orders through acceptance and filing of the same is inapplicable. There was nothing presented at the evidentiary hearing or in Hess's pleadings to suggest that APT's performance under the contract was contingent on Hess sending it Purchase Orders.

In fact, the evidence at the hearing established that before the first Purchase Order was sent to APT it had already begun performing under the contract and executing the Parties' agreement.

32

Hess did not establish the importance of the Purchase Orders at the evidentiary hearing, and thus the Court cannot find, as a matter of law, that they stand as individual contracts.    Cf. New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 31-32 (2d. Cir. 1997).

## V. Conclusion

The Court finds that the Hess Purchase Orders were not formally incorporated by reference into the Parties' contract.   The behavior and knowledge of the Parties prior to and in the course of forming the contract fails to establish that Purchase Orders used by Hess were identified beyond all reasonable doubt to APT such that they could be incorporated by implication into the contract. There is no evidence that New York courts would adopt Hess's theory that because the purchase orders were the vehicles through which the Parties conducted their business, their terms should be read into the contract.   Even if New York did adopt this theory, there was insufficient evidence to establish that APT could not perform on the contract without the Purchase Orders being issued by Hess. Any argument that the two documents should be read together because they were executed at the same time is waived, and the evidence did not establish a mutual intent by the Parties to have the Court read the two documents together as one.    Finally, the thirty-two Purchase Orders do not as a matter of law stand as individual contracts, because they contemplated the identical subject matter and consideration between the Parties as the 91-page contract.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Defendant Hess Corporation's Motion And Incorporated Memorandum Of Law To Stay The Litigation And Compel Arbitration, Or, In The Alternative, To Transfer Venue (DE 12) be and the same is hereby **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this _31st_ day of _OCTOBER_, 2008.

WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel of Record

34